# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**BLANCA R. MORALES AGUILERA**
           **Plaintiff,**

           **v.**                                        **Case No. 13-C-1248**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
                    **Defendant.**

---

## DECISION AND ORDER

Plaintiff Blanca Morales Aguilera applied for disability benefits, claiming that she could not work due to lupus, fibromyalgia, and depression, but the Social Security Administration ("SSA") denied her application initially and on reconsideration, as did an administrative law judge ("ALJ") after a hearing. When the Appeals Council denied plaintiff's request for review the ALJ's decision became the final word from the Commissioner on plaintiff's application. See Moore v. Colvin, 743 F.3d 1118, 1120 (7th Cir. 2014). Plaintiff now seeks judicial review of that decision. On review of the record and the parties' submissions, I affirm.

## I. APPLICABLE LEGAL STANDARDS

### A.     Disability Standard

Disability is determined under a sequential  five-step test, under which the ALJ asks:

(1) is the claimant engaging in "substantial gainful activity" ("SGA");[1]

---

[1]"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, for pay or profit. 20 C.F.R. § 404.1572. The regulations set forth earnings levels ordinarily indicative of SGA. See 20 C.F.R. § 404.1574(b)(2).

(2) if not, does the claimant have a "severe" impairment;[2]

(3) if so, is the impairment one that the Commissioner considers conclusively disabling;[3]

(4) if not, does the claimant possesses the residual functional capacity ("RFC") to perform her past relevant work;[4] and

(5) if not, is she capable of performing any other work in the national economy. See, e.g., Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520).

---

[2]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii)(c).

[3]These conclusively disabling impairments are compiled in 20 C.F .R. Pt. 404, Subpt. P, App. 1 (i.e., "the Listings"). To meet or equal a Listing, the claimant must satisfy all of its "criteria." For instance, pertinent to this case, in order to meet the Listing 12.04 for affective disorders such as depression, the claimant must demonstrate the necessary degree of limitation under the "paragraph B criteria": (1) activities of daily living ("ADL's"); (2) social functioning; (3) concentration, persistence, and pace ("cpp"); and (4) episodes of decompensation. The ALJ evaluates the degree of limitation in the first three areas on a five-point scale: none, mild, moderate, marked, and extreme, and the degree of limitation in the fourth area (episodes of decompensation) on a four-point scale: none, one or two, three, and four or more. 20 C.F.R. § 404.1520a(c). In order to be considered disabled, the claimant must have at least two of the following: (1) marked restriction of ADL's; (2) marked difficulties in maintaining social functioning; (3) marked deficiencies of cpp; or (4) repeated episodes of decompensation, each of extended duration. Larson v. Astrue, 615 F.3d 744, 748 (7th Cir. 2010). Listing 14.02 deals with immune system disorders, including systemic lupus erthyematosus ("SLE"). 20 C.F.R. pt. 404, subpt. P, app. 1, § 14.02. To meet Listing 14.02(A), a claimant must demonstrate that she suffers from SLE accompanied by the involvement of two or more organs/body systems, with one of the organs/body systems involved to at least a moderate level of severity; and at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss). Id. § 14.02(A). Alternatively, a claimant can meet Listing 14.02(B) if she suffers from repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level: limitation of ADL's, limitation in maintaining social functioning and limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace. Id. § 14.02(B). There is no specific Listing for fibromyalgia. See, e.g., Kwitschau v. Colvin, No. 11 C 6900, 2013 WL 6049072, at *7 (N.D. Ill. Nov. 14, 2013).

[4]RFC is the most an individual can do, despite her impairments, on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *2.

The claimant bears the burden of proof at the first four steps, but if she reaches step five the burden shifts to the government to produce evidence that the claimant can perform other jobs that exist in a significant quantity in the economy. Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011). In meeting this burden, the ALJ will often rely on testimony from a vocational expert ("VE"), who provides an impartial assessment of the types of occupations in which persons sharing the claimant's characteristics can work and the availability of positions in such occupations. Id. (citing Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009)).

**B.    Judicial Review**

The reviewing court does not re-determine disability but rather ensures that the ALJ applied the correct legal standards and supported his decision with "substantial evidence." Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Moore, 743 F.3d at 1120-21. To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by re-weighing the evidence, resolving material conflicts, or reconsidering facts or credibility. Beardsley v. Colvin, No. 13-3609, 2014 WL 3361073, at *2 (7th Cir. July 10, 2014). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the ALJ's resolution of that conflict. Id. Finally, while the ALJ must in rendering a decision build an accurate and logical bridge from the evidence to his conclusion, he need not provide a complete written evaluation of every piece of testimony and evidence. Pepper v. Colvin, 712 F.3d 351, 362 (7th Cir. 2013). Rather, he need only articulate, at some minimum level, his analysis of the record so that the reviewing court can follow his reasoning. Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995).

## II. FACTS AND BACKGROUND

### A.  Summary of the Case

Plaintiff was diagnosed with lupus[5] in 2006, with her rheumatologist subsequently assessing fibromyalgia as well.[6]  Plaintiff's doctors also noted symptoms of depression, encouraging her to seek psychiatric treatment, although she did so for just a brief period in late 2011.  Plaintiff also irregularly complied with treatment recommendations for both her fibromyalgia and lupus.

Plaintiff's written reports and the SSA's earnings data reflect a rather limited employment history; as is pertinent here, she worked for the City of Milwaukee from January 2004 to December 2006 and for Rockwell from April 2007 to May 2008 doing data entry and customer service work.  In 2008 and 2009, after she stopped working, she completed a cosmetology program.

Plaintiff initially applied for social security in 2007, alleging a disability onset date of August 31, 2007, but that application was denied at the reconsideration level on May 13, 2008.

---

[5]Systemic lupus erythematosus ("SLE") is an autoimmune disease in which the body's immune system mistakenly attacks healthy tissue.  It can affect the skin, joints, kidneys, brain, and other organs.  Symptoms vary from person to person, and they may come and go.  Almost everyone with SLE has joint pain and swelling.  Some develop arthritis. The joints of the fingers, hands, wrists, and knees are often affected.  Other common symptoms include fatigue, fever, hair loss, sensitivity to sunlight, and skin discoloration when cold (Raynaud's phenomenon).  See http://www.nlm.nih.gov/medlineplus/ency/article/000435.htm.

[6]Fibromyalgia is a rheumatic condition characterized by pain, fatigue, and stiffness. There are no laboratory tests for the presence or severity of fibromyalgia.  Rather, it is typically diagnosed through the presence of tender spots, "more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch."  Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996); see also SSR 12-2p, 2012 WL 3104869, at *2-3 (discussing the two accepted methods of diagnosing fibromyalgia).

She filed the instant application in July 2010, alleging an onset date of June 1, 2007, although at the hearing before the ALJ her lawyer amended the date to August 15, 2007, requesting that the previous application be re-opened.  The ALJ found that plaintiff was not disabled at any time.  In the sub-sections that follow, I review the medical evidence, the administrative proceedings, and the ALJ's decision.

## B.    Medical Evidence

On May 25, 2006, plaintiff went to the St. Luke's Hospital emergency room ("ER") complaining of left hand pain and swelling.  X-rays were negative, and ER doctors diagnosed cellulitis,[7] providing antibiotics, pain medication, and a splint.  (Tr. at 1200-01.)  She returned to the ER the following day with worsening pain and swelling, and doctors admitted her for a course of IV antibiotics, again suspecting left hand cellulitis.  By the time of her discharge on May 28, 2006, doctors believed plaintiff's acute left hand swelling and pain was likely secondary to a connective tissue disorder.  Rheumatic testing came back high, with positive ANA,[8] so she was referred to a rheumatologist (Tr. at 1202-08), and Dr. Irina Konon subsequently diagnosed lupus, starting plaintiff on Prednisone[9] and Naproxen[10] (Tr. at 1210).

---

[7]Cellulitis is inflammation of subcutaneous, loose connective tissue.  Stedman's Medical Dictionary 317 (27th ed. 2000).

[8]Antinuclear antibodies ("ANA") are substances produced by the immune system that attack the body's own tissues.  The presence of ANA in the blood may be due to variety of conditions, including myositis (inflammatory muscle disease), rheumatoid arthritis, or SLE. http://www.nlm.nih.gov/medlineplus/ency/article/003535.htm.

[9]Prednisone is used to treat various conditions, including lupus.  It works by reducing swelling and redness and by changing the way the immune system works. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.htm.

[10]Naproxen is used to relieve pain, tenderness, swelling, and stiffness caused by rheumatoid arthritis.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html.

On August 25, 2006, plaintiff went to the St. Luke's ER complaining of epigastric and sub-sternal chest discomfort. An EKG and chest x-ray were normal, and doctors administered a GI cocktail with improvement of symptoms. The ER doctor spoke to Dr. Konon,[11] and they decided to stop Naproxen, increase Prednisone, and start plaintiff on Omeprazole.[12] The ER doctor also provided a prescription for Tramadol.[13] (Tr. at 1210-14.) Plaintiff was subsequently lost to rheumatoligic follow up between January 2007 to August 2007. (Tr. at 273, 456.)

On June 4, 2007, plaintiff saw her primary care physician at Procare Medical Group, Dr. Mohammad Nwilati, complaining of sore throat, fever, chills, and coughing. (Tr. at 635.) He assessed pharyngitis, providing Z-Pak,[14] Robitussin for cough, and Esgic[11] for headache. (Tr. at 636.) On July 23, plaintiff saw another physician at Procare, Dr. S. Razzaq, complaining of sore throat, cough, fever, chills, and left ear pain. Dr. Razzaq assessed pharyngitis and upper respiratory infection ("URI"), providing Amoxicillin and Ibuprofen with an "excuse for today and tomorrow." (Tr. at 634.)

On August 1, 2007, plaintiff returned to Dr. Konon with worsening SLE activity. She

---

[11]The ER note refers to Dr. "Cronin," but I assume this is actually Dr. Konon, plaintiff's then treating rheumatologist.

[12]Omeprazole is used to treat gastroesophageal reflux disease ("GERD"), a condition in which backward flow of acid from the stomach causes heartburn and possible injury of the esophagus. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html.

[13]Tramadol, a narcotic analgesic, is used to relieve moderate to moderately severe pain. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html.

[14]Z-Pak (a/k/a Zithromax or Azithromycin) is an antibiotic used to treat bacterial infections. http://www.drugs.com/mtm/zithromax-z-pak.html.

[11]Esgic, a combination of acetaminophen, caffeine and butalbital, is used for the treatment of episodic headaches. http://www.headaches.org/education/Medications/Esgic.

indicated that she was thinking of quitting her job due to hand pain. She also reported pain in her feet, shoulders, and hips, plus a.m. stiffness lasting through the mid-day. She was using Ibuprofen but had stopped taking Prednisone several months ago. (Tr. at 522, 696.) Review of her systems was mostly negative. (Tr. at 697.) On exam, she had synovitis (inflammation) of the finger joints and right wrist tenderness to palpation; her knees, ankles, and feet were OK. (Tr. at 699.) Dr. Konon provided Plaquenil,[12] obtained blood and urine work for evaluation, and emphasized the importance of regular follow up. (Tr. at 700, 742.)

On August 15, 2007, plaintiff reported persistent and worsening joint pain and stiffness, with difficulty getting out of bed. She had started the Plaquenil, with no side effects. (Tr. at 434, 693.) Review of systems was mostly negative, aside from the musculoskeletal complaints. On musculosketal exam, plaintiff displayed bilateral hand and foot synovitis and tenderness, and 18/18 tender points.[13] (Tr. at 445, 694.) Dr. Konon again discussed with plaintiff the seriousness of her diagnosis, adding Prednisone. (Tr. at 456, 695.) They also discussed the need to add another medication, such as Azathioprine.[14] (Tr. at 456, 467, 511, 696.) On September 13, plaintiff reported several episodes of chest pain and shortness of breath; she also reported waking up with generalized body pain starting in her neck and going

_____

[12]Plaquenil (a/k/a Hydroxychloroquine) is used to treat SLE and rheumatoid arthritis in patients whose symptoms have not improved with other treatments. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601240.html.

[13]This is consistent with a diagnosis of fibromyalgia. See Sarchet, 78 F.3d at 306.

[14]Azathioprine is used to treat severe rheumatoid arthritis (a condition in which the body attacks its own joints, causing pain, swelling, and loss of function) when other medications and treatments have not helped. It is in a class of medications called immunosuppressants and works by decreasing the activity of the body's immune system so it will not attack the joints. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682167.html.

down her spine. (Tr. at 240, 689.) Physical exam revealed decreased synovitis in the bilateral hands, tenderness in the bilateral wrists, and right elbow tenderness. (Tr. at 251, 691.) Dr. Konon decided to admit plaintiff for a cardiac evaluation.[15] She further noted that plaintiff's SLE levels had improved, but that she would need to start on Azathioprine after her chest pain issues were sorted out. (Tr. at 274, 285, 692.) On September 27, plaintiff advised Dr. Konon that her hand swelling was improved on Prednisone. She did report being under a lot of stress related to a child custody proceeding in Puerto Rico, which made her lupus symptoms worse. (Tr. at 682, 772.) Her exam was normal aside from mild synovitis of the right hand. (Tr. at 684, 773-74.) Plaintiff was willing to start on Azathioprine after she returned from Puerto Rico. (Tr. at 685, 775.) Plaintiff also saw Dr. Nwilati on September 27, indicating that she had been unable to work since August 31, 2007 due to a severe exacerbation of SLE. (Tr. at 632.) However, exam was essentially normal. Dr. Nwilati kept her off work, told her to continue with her medication, and to see her rheumatologist. (Tr. at 633.)

On October 17, 2007, plaintiff advised Dr. Konon that she had recently started on Azathioprine after coming back from Puerto Rico. She continued to have pain in her hands and knees but with no swelling or erythema. She noticed more Raynaud's symptoms with the weather getting colder. (Tr. at 678, 785.) Exam was negative. (Tr. at 679-80, 786-87.) Dr. Konon discussed the importance of staying warm, wearing gloves, as well stress management. (Tr. at 682, 788.)

On October 25, 2007, plaintiff saw Dr. Nwilati, complaining of earache, sore throat, fever, chills, and coughing. Strep test was negative, and Dr. Nwilati provided Z-Pak and

---

[15]The cardiac studies were essentially unremarkable, with doctors suspecting the chest pain likely secondary to GERD and some component of anxiety. (Tr. at 361.)

eardrops. (Tr. at 628.) On November 29, plaintiff saw Dr. Luis Galang at Procare, complaining of stuffiness, congestion, and toothache. He assessed sinusitis, bronchitis, and tooth abscess, providing Augmentin,[16] Robitussin, and Nasonex, and advising plaintiff to see a dentist. (Tr. at 627.)

On January 14, 2008, plaintiff returned to Dr. Konon, indicating that she had been doing well since her last rheumatology visit. She had decreased her Prednisone dose on her own and reported arm pain the previous day, improved by today. She also reported Raynaud's symptoms in cold weather. (Tr. at 673, 807.) Exam was normal. (Tr. at 674-75, 808-09.) Dr. Konon increased Azathioprine, as plaintiff still had episodes of joint swelling and pain, and continued Prednisone and Plaquenil. Plaintiff was to return in two months. (Tr. at 677, 809-10.)

On February 4, 2008, plaintiff saw Dr. Galang, complaining of stuffiness, congestion, and dizziness. He assessed sinusitis, providing Mucinex and Flonase. (Tr. at 626.)

On March 17, 2008, plaintiff returned to Dr. Konon, again reporting that she had been doing well since her last visit, with improved joint pain and good energy level. She tried to stop Prednisone on her own but started having more pain in her hands and so resumed. (Tr. at 669, 827.) On exam, she had normal range of motion, with no swelling, redness, or tenderness. (Tr. at 671, 829.) After checking routine labs, Dr. Konon increased Azathioprine due to persistent a.m. stiffness. Dr. Konon also wanted to attempt to slowly wean plaintiff from Prednisone, with follow up in two months. (Tr. at 672, 829-30.)

On April 22, 2008, plaintiff saw Dr. Nwilati, complaining of sore throat, fever, chills, and

---

[16]Augmentin (a/k/a Amoxicillin) is a broad-spectrum antibacterial primarily used to treat respiratory tract infections. http://www.ncbi.nlm.nih.gov/pubmed/14726431.

coughing.  He assessed an URI, providing Z-Pak and Robitussin and advising her to rest and drink fluids.  (Tr. at 625.)  On May 22, plaintiff saw Dr. Galang, complaining of right ear pain. Dr. Galang assessed otitis externa and otitis media,[17] providing Augmentin and other medications.  (Tr. at 624.)

Plaintiff returned to the rheumatology clinic on June 18, 2008, again doing well since her last visit, weaning her Prednisone down to 6 mg per day.  She noted no joint swelling or morning stiffness aside from that a.m. when she woke up with pain in her feet.  She went back to bed and when she got up around 10:00 a.m. the pain was gone.  (Tr. at 305, 854.)  Review of systems was negative.  On physical exam, she had normal range of motion, with no swelling, redness, or tenderness.  (Tr. at 308, 855-56.)  Her Prednisone was further decreased (Tr. at 667, 856), and she was to follow up in three months (Tr. at 857).  However, she received no further rheumatologic care until March 2, 2009, when she returned to Dr. Konon.[18]  Despite the gap in treatment, plaintiff reported doing well overall, with occasional arthralgia but no joint swelling or stiffness,[19] and good energy level.  She had been able to lose weight with the lower Prednisone dose.  She reported some Raynaud's symptoms over the winter, but not very bothersome.  She displayed no synovitis of the bilateral upper and lower extremities.  (Tr. at 303, 416.)  She had normal range of motion, with no swelling, no redness, and no tenderness.

---

[17]Otitis externa (also known as swimmer's ear) is an inflammation of the outer ear and ear canal.  http://en.wikipedia.org/wiki/Otitis_externa.  Otitis media is the medical term for middle ear infection.  http://en.wikipedia.org/wiki/Otitis_media.

[18]In the interim, she was seen by other providers for a fractured thumb in August 2008 (Tr. at 1135); flu-like symptoms in November 2008 (Tr. at 621-23); and sore throat, fever, and chills in February 2009 (Tr. at 620).

[19]Arthralgia means pain in a joint.  http://www.ncbi.nlm.nih.gov/books/NBK303/.

Dr. Konon ordered lab work and would consider lowering Prednisone once received. (Tr. at 302, 304, 417.)

On March 16, 2009, plaintiff saw Dr. Galang, complaining of chills, fever, achiness, and congestion. He assessed sinusitis, providing Z-Pak, Mucinex, and pain medication. (Tr. at 619.) Plaintiff saw Dr. Nwilati on March 19, complaining of arthralgia associated with fever. Although she had been taking her medications for lupus, Dr. Nwilati was concerned this was an exacerbation of her lupus because her symptoms were non-specific. He ordered blood work and told her to contact her rheumatologist. (Tr. at 618.) On March 27, plaintiff went to the St. Luke's ER for a cough. Doctors diagnosed sinusitis, which they treated with Zithromax. (Tr. at 1016.) She returned on March 31, indicating that the Z-Pak was not helping. Flu test was negative, and doctors saw no need for further antibiotics, providing Tussinex for cough and Guaifenesin for congestion.[20] (Tr. at 1006.)

On May 6, 2009, plaintiff went to the St. Francis Hospital ER for abdominal pain. (Tr. at 1136.) Doctors provided Ondansetron[21] (Tr. at 1138), discharging her in good condition (Tr. at 1139). On May 19, plaintiff saw Dr. Galang complaining of stomach-ache. He assessed intestinal flue, providing Levsin.[22] (Tr. at 617.) She again saw Dr. Galang on June 1,

---

[20]Guaifenesin, an expectorant, is used to relieve chest congestion. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682494.html.

[21]Ondansetron is used to prevent nausea and vomiting caused by chemotherapy, radiation, or surgery. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601209.html.

[22]Hyoscyamine (Levsin) is used to control symptoms associated with disorders of the gastrointestinal (GI) tract. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684010.htm.

complaining of stomach-ache and diarrhea, receiving Lomotil.[23]  (Tr. at 616.)

On June 3, 2009, plaintiff returned to Dr. Konon for follow up of her SLE, doing well since her last visit, with no joint pain, swelling, or stiffness, and good energy level.  She did complain of intermittent Raynaud's phenomenon on exposure to cold, but denied fevers, fatigue, morning stiffness, joint pain, and muscle weakness.  (Tr. at 294, 297, 441.)  Review of systems was negative, including musculoskeletal (no swollen painful joints, myalgias, or weakness) and psychiatric (no anxiety or depression).  (Tr. at 295.)  On exam, she had normal range of motion, no swelling, no redness, and no tenderness.  Noting no active disease activity, Dr. Konon reduced Prednisone but continued Azathioprine and Plaquenil, advising plaintiff to avoid cold exposure and wear protective clothing and sun screen when exposed to the sun. (Tr. at 299, 443, 447.)

On June 15, 2009, plaintiff saw Dr. Galang, complaining of joint pain in the shoulder, elbow, and knees.  She was able to ambulate but was having joint pain more persistently.  Dr. Galang assessed arthritis, providing medication.  (Tr. at 615.)   On July 13, she saw Dr. Nwilati, complaining of sore throat, fever, and coughing.  She had been taking her medication for lupus, which appeared to be OK.  Dr. Nwilati diagnosed an URI, providing Z-Pak and Robitussin.  (Tr. at 614.)  On August 25, plaintiff saw Dr. Razzaq, complaining that she was tired, dizzy, and nauseated, with an unsteady gait.  Dr. Razzaq assessed gastritis, presyncopal episode, and

---

[23]Lomotil   is   a   prescription   medicine   used   to   treat   diarrhea. http://www.nlm.nih.gov/medlineplus/ency/article/002668.htm.

vertigo, ordering tests and providing Rantidine[24] and Meclizine.[25]  (Tr. at 612-13.)  He also ordered an echocardiogram.  (Tr. at 638, 666.)

On September 8, 2009, plaintiff returned to Dr. Konon, reporting left hand pain, which started the previous week at cosmetology school after she lifted a heavy trunk.  She also reported pain holding a dryer in her left hand.  (Tr. at 289, 486.)  On psychiatric exam, she was oriented x3, with normal mood and affect.  On musculoskeletal exam, she displayed normal range of motion, with no swelling, no redness, and no tenderness (aside from the left wrist).  (Tr. at 291, 488.)  For lupus, plaintiff was to continue on Azathioprine, Prednisone, and Plaquenil; for wrist tendonitis, she was to apply ice, heat, and Voltaren gel, use a left wrist splint, and try to modify her activity at school. (Tr. at 293, 469, 477, 491, 501.)

On September 29, 2009, plaintiff saw Dr. Abdullattief Sulieman at Procare complaining of runny nose, sneezing, fever, and cough.  She gave a history of ache, with some joint pain.  Dr. Sulieman assessed flu-like illness with chest infection, providing a course of Z-Pak, Robitussin, and Tylenol, and an excuse from school for two days.  (Tr. at 608-09.)  On October 6, plaintiff saw Dr. Nwilati, indicating that she had felt slightly better but now the symptoms were coming back: cough, sore throat, and fever.  She also complained of low energy, believing this was more from the flu than her lupus.  Dr. Nwilati assessed URI and bronchitis, providing Z-Pak and Robitussin.  (Tr. at 607.)  On October 19, she saw Dr. Sulieman complaining of sore throat, cough, and fever.  She denied any history of joint pain.  On exam, she had full range of motion

---

[24] Ranitidine is used to treat GERD. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601106.html.

[25] Meclizine is used to prevent and treat nausea, vomiting, and dizziness caused by motion sickness.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682548.html.

of upper and lower extremities, no rash or skin lesions.  For sore throat, she was given a course of Z-Pak.  She was also given Robitussin for cough and  Tylenol for her fever.  (Tr. at 605-06.)

On November 9, 2009, plaintiff saw Dr. Sulieman complaining of pain in both thighs and muscle ache all over the body.  On exam, she had full range of motion of the upper and lower extremities.  Dr. Sulieman provided Ibuprofen for myalgia and joint pain.  (Tr. at 604.)  Later that month, plaintiff when to the St. Luke's ER for knee pain.  X-rays were unremarkable, and she was advised to rest, ice, and elevate the knee, and use Ibuprofen.  (Tr. at 1000, 1003.)

On December 14, 2009, plaintiff returned to Dr. Konon, doing well since her last visit, with no hair loss, joint pain or swelling, or ulcers.  She did report weight gain, noting that she had not been following a particular diet or exercising.  (Tr. at 283, 518, 533.)  Review of systems was negative.  (Tr. at 284, 519.)  On exam, she had normal range of motion, with no swelling, no redness, and no tenderness.  (Tr. at 286, 520.)  Dr. Konon continued Azathioprine, Prednisone, and Plaquinel for lupus, noting no apparent ill effects from the medication, and discussed healthy diet and exercise regarding plaintiff's weight gain. (Tr. at 287, 521.)

On March 10, 2010, plaintff saw Dr. Razzaq, complaining of cellulitis and swelling of the left fourth finger, as well as back pain.  She was supposed to be on Prednisone but was not taking it.  On exam, her left fourth finger showed significant swelling with tenderness and erythema.  Dr. Razzaq diagnosed low back pain, cellulitis of the left fourth finger, lupus history, and non-compliance.   Dr. Razzaq told her to take her medication as prescribed by her rheumatologist, advised her to use Ibuprofen for pain, and ordered an x-ray of the lower back. (Tr. at 603.)

On March 15, 2010, plaintiff saw Dr. Matthew Ehrhart in the rheumatology clinic for

14

follow up of her SLE. She reported doing very well since her last visit, with no joint effusions. She also denied fatigue, joint pain, or muscle weakness, and reported walking twice per day for one hour. Exam was largely negative. Dr. Ehrhart continued Azathioprine and Plaquenil, and decreased Prednisone, noting no apparent ill effects of medication. (Tr. at 276-78, 280, 282, 543-44, 546, 548, 550.)

On March 18, 2010, plaintiff saw Dr. Galang, with a chief complaint of stuffiness and congestion, going on for about three days. She also reported low back pain for about three weeks. Exam was essentially negative. Dr. Galang assessed sinusitis and lupus, advising her to return for follow-up. (Tr. at 602.) On March 27, plaintiff went to the St. Frances Hospital ER with URI symptoms and back pain. A lumbar spine x-ray was unremarkable. Doctors diagnosed lumbosacral strain, discharging her home in good condition. (Tr. at 1141-47.)

On April 22, 2010, plaintiff saw Dr. Konon in rheumatology for follow up of her lupus. Since her last visit, she had stopped taking all lupus medications, including Plaquinel, Prednisone, and Azathioprine, but was nevertheless doing well. She stated that she had been praying and believed that would help her condition. She denied any arthralgia/arthritic pain that usually occurs during a lupus flare. Dr. Konon strongly encouraged plaintiff to continue taking her medications; although she did not have physical manifestations, laboratory markers indicated active lupus. (Tr. at 269, 271-72, 564, 566, 569.)[26]

Plaintiff returned to Dr. Konon on August 11, 2010, with "multiple somatic complaints." (Tr. at 263, 583, 925.) Plaintiff stated that she had not been doing well since her last

---

[26]On August 5, 2010, plaintiff went to the St. Francis Hospital ER, with a sore throat and ear ache. Doctors gave her Penicillin and discharged her home in good condition. (Tr. at 1148-52.)

rheumatology visit, indicating that her body hurt all over, in her joints as well as her muscles. She also noted that her skin hurt when exposed to the sun. (Tr. at 266, 583, 929.) On exam, she had normal range of motion, no swelling, and no redness, but did display diffuse tenderness to palpation and trigger point tenderness at the chest, neck, arms, knees, and hips. She was currently taking Plaquenil and Azathioptrine. She noted being under a lot of stress recently and was likely experiencing worsened symptoms of lupus in addition to fibromyalgia. Plaintiff was instructed to try Omeprazole for stomach discomfort, start Prednisone, and try Tylenol as needed for low back pain. She was to try heat and gentle stretching as well. (Tr. at 241, 265, 268, 585-86, 588, 928, 931.)

On August 20, 2010, plaintiff saw Dr. Galang, complaining of headache and pain in the neck, shoulders, and left chest following a recent car accident. On exam, she had full range of motion of the neck and no tenderness; full range of motion of both upper and lower extremities; and no tenderness or deformity in both shoulders. Dr. Galang assessed musculoskeletal strain of the shoulders, neck, and left chest, advising her to continue present medications and return for follow up. (Tr. at 601.) August 23 spine x-rays showed dextroscoliosis of the thoracic spine, minimal levoscoliosis and narrowing of the lumcosacral disc space of the lumbar spine, and reversal of the normal lordotic curve of the cervical spine. (Tr. at 662-63.)

On August 25, 2010, plaintiff went to the St. Luke's ER with left upper epigastric and diffuse abdominal discomfort. Doctors provided morphine, and she appeared more comfortable. The doctor believed her pain related to ovarian cyst and fibroids; there was also evidence of urinary tract infection ("UTI"). (Tr. at 974.) She was to follow up with her gynecologist. (Tr. at 975.) An August 25 pelvic ultrasound showed a probable small fibroid in

the lower uterine segment and bilateral ovarian cysts. (Tr. at 1219-20.)

On August 31, 2010, plaintiff saw Dr. Konon in rheumatology for follow up of her SLE. (Tr. at 243, 246, 256.) She reported neck pain following her recent car accident. She went to the emergency room, had x-rays, and was given pain medications and referred to physical therapy ("PT"). She otherwise reported feeling a bit better but still had generalized pain. (Tr. at 246, 256, 920.) Physical exam was essentially normal, with normal range of motion, no swelling, no redness, and no tenderness. (Tr. at 248, 258, 922.) Dr. Konon noted that plaintiff was now back on her medications for SLE (Plaquenil and Azathioprine) and decreased the Prednisone dose. For generalized pain/fibromyalgia/depression, plaintiff agreed to a trial of Cymbalta. For her neck strain, she was to continue in PT. (Tr. at 250, 255, 260, 924.) She was to return in two months. (Tr. at 252, 924.)

On September 8, 2010, plaintiff saw Dr. Nwilati, complaining of intermittent chest pain and shortness of breath, as well as back pain. On exam, she had no peripheral edema or digital cyanosis but did have tenderness over the paraspinal muscles of the lumbosacral spine. Dr. Nwilati conducted an EKG, ordered an echo and stress test, and provided Flexeril[27] for back pain. (Tr. at 600, 652.) On September 13, plaintiff saw Dr. Razzaq, complaining of back pain and stiffness. He assessed cervical, lumbosacral, and thoracic strain, headache, and history of contusion, providing Vicodin, continuing PT, and referring her for an MRI. (Tr. at 654-55.) The September 14 MRI of the lumbar spine showed dessication of the L4-L5 disc with no evidence of disc herniation, and dessication of the L5-S1 disc with no evidence of herniation.

---

[27]Flexeril (a/k/a Cyclobenzaprine) is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html.

(Tr. at 664.)  On September 22, plaintiff returned to Dr. Razzaq for follow up, noting that her back pain was getting better.  Dr. Razzaq assessed lumbosacral strain, cervical strain, thoracic strain, headaches, and contusions, advising her to continue with PT.  (Tr. at 651.)

On September 28, 2010, plaintiff saw Dr. Nwilati, with intermittent shortness of breath and chest pain. He sent her for cardiology evaluation, which showed normal coronaries and normal LV function.  Her back pain was better.  (Tr. at 656-57, 1153.)

On November 1, 2010, plaintiff returned to Dr. Konon, complaining of wrist pain.  She further indicated that she had not been sleeping well, and that Cymbalta was not covered by her insurance.  (Tr. at 915-16.)  Musculoskeletal exam was negative, without swollen painful joints, myalgias, or weakness.  (Tr. at 917.)  Dr. Konon continued plaintiff on Azathioprine, Prednisone, and Plaquenil at current doses.  In place of Cymbalta, Dr. Konon tried Flexeril. (Tr. at 919.)

On November 30,  2010, after she had filed her application for benefits, plaintiff underwent a consultative psychological evaluation with Evan Bestland, Ph.D.  Her chief complaint was pain, mainly in her hands; she also mentioned feelings of anxiety and some depression.  (Tr. at 870.)  Plaintiff reported overall problems with her memory and was vague regarding her background.  (Tr. at 871.)  On mental status exam, she presented with overall memory issues; most aspects of memory (recent, remote, and rote) were problematic.  Dr. Bestland further noted a kind of limited response to overall cognitive ability questions.  (Tr. at 875.)  She did not indicate any hallucinatory experiences, mostly the difficulty with depression and with pain.  (Tr. at 875.)  Dr. Bestland diagnosed depressive disorder; pain disorder associated with psychological factors and general medical condition (lupus); with a GAF of 41

18

to 50 and a "fair" prognosis.[28]  He opined that she would benefit from assessment and/or treatment in a pain clinic to determine her employability (if any).  (Tr. at 876.)

On December 10, 2010, state agency consultant Dr. Pat Chan completed a physical RFC assessment report for the SSA, finding plaintiff capable of light work with no concentrated exposure to hazards.  (Tr. at 878-84.)  On review of her records, Dr. Chan found plaintiff's SLE essentially stable with minimal exacerbations, nothing serious since 2007.  She had complained of dizziness and vertigo, but neurological exam was non-focal.  Dr. Chan therefore adopted a light RFC with avoidance of heights and hazards.  Dr. Chan found plaintiff's reports of pain and limited functioning not fully supported by objective evidence and thus not fully credible.  (Tr. at 885.)

On December 13, 2010, consultant Esther Lefevre, Ph.D., completed a psychiatric review technique form ("PRTF") for the SSA, evaluating plaintiff under Listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.07 (somatoform disorders).  (Tr. at 886.) Under the B criteria of those Listings, she found mild restrictions of ADL's, no difficulties in social functioning, moderate difficulties in cpp, and no episodes of decompensation.  (Tr. at

---

[28] GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and her overall level of functioning.  Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others.  Scores of 81-90 reflect "minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms, 31-40 some impairment in reality testing, 21-30 behavior considerably influenced by delusions or hallucinations, and 11-20 some danger of hurting self or others.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).  The fifth edition of the DSM, published in 2013, abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  Williams v. Colvin, No. 13-3607, 2014 WL 2964078, at *2 (7th Cir. July 2, 2014) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013)).

896.)  In a mental RFC report, Dr. Lefevre found moderate limitation in plaintiff's ability to understand and carry out detailed instructions, but no other significant limitations.  (Tr. at 900-01.)  In the narrative section of the report, Dr. Lefevre found plaintiff capable of unskilled work, noting that her presentation at the mental status exam was not consistent with the objective evidence or the ADL form she completed.  Her statements were not fully credible.  (Tr. at 902.)

On January 11, 2011, plaintiff returned to Dr. Konon, noting a two day history of bilateral foot pain, which started after she went grocery shopping.  She had trouble standing after that.  She also developed an URI.  She further reported jamming her right thumb while making her bed; she went to the ER and had a splint placed; an x-ray showed no fracture.  (Tr. at 910, 964-65, 1224.)  Review of systems was negative (Tr. at 911), and physical exam normal (Tr. at 912).  Dr. Konon increased plaintiff's Azathioprine due to increased SLE activity, continuing Prednisone and Plaquenil.  (Tr. at 915.)

On January 31, 2011, plaintiff saw Christiana Phillips, PA-C, at Procare regarding her lupus and nasal congestion.  Plaintiff said that she did not like Dr. Konon and wanted a second opinion.  She felt that her symptoms were not being properly treated, and that she still had pain in her hands and sides, as well as chronic fatigue and chronic arthralgias throughout her body.  (Tr. at 658.)  PA Phillips referred plaintiff for a rheumatology consult and provided medication for her cold.  She was also to use over the counter Motrin as needed.  (Tr. at 659.)

On March 28, 2011, plaintiff saw Dr. Nwilati, complaining of severe tooth pain; she had no insurance to see dentist.  She went to the ER, receiving Percocet and Penicillin, but stopped taking it after she threw up.  Dr. Nwilati referred her to a dentist, told her to take her rheumatoid medication, and to stop taking Percocet.  (Tr. at 660.)

On May 5, 2011, consultant Dr. Joan Kojis completed a PRTF for the SSA, evaluating

20

plaintiff under Listings 12.04 (affective disorders) and 12.07 (somatoform disorders). (Tr. at 1047.) Under the B criteria, Dr. Kojis found moderate restriction of ADL's, mild difficulties in social functioning, moderate difficulties in maintaining cpp, and no episodes of decompensation. (Tr. at 1057.) Dr. Kojis concluded that plaintiff had severe limitations due to her depression and pain related to her physical condition. She had some moderate issues with memory, concentration, daily functioning, and social interactions. However, she was able to relate to and communicate with others appropriately, and would not be substantially limited in her social abilities on a job. She had limited activities and concentration due to her pain and fatigue, but she had been able to recently get her driver's license and was able to get out of the house, shop, and pay bills. In sum, she was restricted to no more than unskilled work. Her reports regarding daily functioning were worse than would be expected given the medical evidence and her reports to doctors. She had pain, but it did not appear to be as limiting as she suggested. (Tr. at 1059.) In a mental RFC report, Dr. Kojis found plaintiff markedly limited in her ability to understand and remember detailed instructions; moderately limited in her ability to carry out detailed instructions, perform within a schedule, perform at a consistent pace, get along with co-workers, and respond to changes; and not significantly limited in other areas. (Tr. at 1061-62.) Dr. Kojis wrote that due to her pain and depression, plaintiff would have some moderate issues going to and staying at work reliably, as well as some concentration issues that would limit her from more than unskilled work tasks and jobs with more than a moderate degree of change. Dr. Kojis concluded that plaintiff should be able to sustain unskilled work. (Tr. at 1062.)

On May 6, 2011, plaintiff saw Dr. Tracy Brenner for the rheumatologic evaluation set up by her primary doctor. Her chief complaint was pain, stiffness, fatigue, and overall myalgias.

21

She reported training in cosmetology and wanted to pursue that but had trouble functioning. For the fibromyalgia, she was on Cyclobenzaprine, which caused morning fatigue/grogginess. She tried exercise at home but did not find it helpful. She also reported a history of depression, although she had never been on an anti-depressant and had missed two appointments for psychiatry referral by her doctor. (Tr. at 1167.) On exam, her joints were free from erythema, warmth or swelling, with full range of motion, and non-tender to palpation. Her lupus appeared quiet at the time. Her chief complaint seemed related to fibromyalgia. Dr. Brenner ordered tests, started plaintiff on Cymbalta, and urged her to keep her appointment for psychiatry referral. (Tr. at 1168.)

On May 9, 2011, consultant Dr. Mina Khorshidi completed a physical RFC report for the SSA, finding plaintiff capable of light work with frequent (not constant) bilateral handling and fingering. (Tr. at 1065-69.) Dr. Khorshidi noted that plaintiff's exams were usually negative, with no synovitis, no swelling/tenderness, and normal range of motion. Dr. Khorshidi found that plaintiff's impairments could reasonably be expected to produce the symptoms alleged but that the claimed intensity and impact of those symptoms was not consistent with the objective evidence. Therefore, Dr. Khorshidi found plaintiff's statements only partially credible. (Tr. at 1072.)

On May 20, 2011, plaintiff saw PA Phillips at Procare for foot pain. Plaintiff indicated that Dr. Brenner had told her she had high arches and needed to see a foot specialist. (Tr. at 1249.) PA Phillips referred plaintiff to Dr. McIver for a podiatry evaluation. (Tr. at 1250.)

On May 27, 2011, plaintiff returned to Dr. Brenner. She reported nausea and vomiting after just one Cymbalta tablet and stopped. She continued to have chronic pain secondary to fibromyalgia, for which she was taking Aleve, and on exam Dr. Brenner found 16/18 tender

points.  Dr. Brenner planned to start a trial of Gabapentin[29] and encouraged aerobic activity. (Tr. at 1169.)  Plaintiff was to follow up in three months.  (Tr. at 1170.)

On July 12, 2011, plaintiff saw Dr. Nwilati, with cold-like symptoms.   She also complained of aches and pains all over her body.  (Tr. at 1251.)  Dr. Nwilati gave her Z-Pak for URI and Xanax to help her sleep at night.  (Tr. at 1252.)  Dr. Nwilati also completed a medical examination and capacity report for plaintiff related to her application for W-2 benefits, listing diagnoses of lupus, arthritis, and depression, with a poor prognosis.  (Tr. at 1079.)  He did not provide any opinion on her physical capacities (e.g., lifting, standing, sitting), instead writing "unable to work now."  (Tr. at 1080.)

On August 3, 2011, plaintiff returned to Dr. Nwilati, indicating that her stress was better but her lupus was acting up, causing pain, especially in the lower back.  Her wrists were also hurting; she was using splints, with some relief.  She worried that her back pain was not related to lupus.  (Tr. at 1253.)  On exam, Dr. Nwilati noted positive straight leg raise.[30]  He ordered an MRI of the spine (Tr. at 1254) and sent her for physical therapy (Tr. at 1093-96, 1254).  On August 11, plaintiff complained of more pain after her first PT session, although medication was providing some relief.  (Tr. at 1255.)  Dr. Nwilati continued medications and told her to continue in PT.[31]  (Tr. at 1256.)

---

[29]Gabapentin is typically used to help control seizures and to relieve the pain of postherpetic neuralgia.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html.

[30]The straight leg raise test is used to determine whether a patient with low back pain has an underlying herniated disk.  Allen v. Colvin, 942 F. Supp. 2d 814, 819 n.5 (N.D. Ill. 2013).

[31]Therapy notes indicate that plaintiff demonstrated improvements in posture and cervical range of motion, but she continued to present with poor exercise tolerance and hypersensitivity.  She was discharged secondary to non-compliance on October 4, 2011; it was recommended that she try an aquatic based exercise program.  (Tr. at 1097.)

On September 21, 2011, plaintiff returned to Dr. Brenner, doing well overall with her SLE well controlled. Her fibromyalgia was mildly improved on Gabapentin, and Dr. Brenner increased the dose and added a low dose of Flexeril. Plaintiff reported benefit from PT but was afraid to go back after suffering some dizziness while in the warm water. (Tr. at 1171.)

On September 27, 2011, plaintiff saw Dr. Nwilati, with sore throat, fever, chills, and coughing. (Tr. at 1257.) He diagnosed URI, providing Z-Pak and Robitussin. He noted that her immune system might be compromised because of the Prednisone, advising her to cut the dose. (Tr. at 1258.) She returned on October 11, again with sore throat, fever, chills, and cough. Dr. Nwilati provided Z-Pak, Robutussin, and Tramadol for pain. (Tr. at 1259-60.)

On October 19, 2011, plaintiff returned to Dr. Brenner, primarily to discuss the results of an August 2011 functional capacity evaluation ("FCE") and final recommendations on her disability paperwork. Dr. Brenner indicated that she personally spoke to the therapists:

> Both physical therapists verbalized that the patient was able to perform all activities. There was no request to stop activities although she was given the option to do so. She was told at the beginning of the session that she could stop it at any time and did not verbalize a wish to do so. It was also stated that she was actually improving regarding her physical therapy and a water exercise program and that they were planning to increase the activity given her level of tolerance. It should be stated that she was a no-show on several water therapy visits but on the last visit, again, she had improved versus the initial evaluation.
>
> With these reports, it was reflected upon in her disability paperwork that she was able to perform the required tasks. Recommended at this time that she could be able to perform at least part-time work allowing for absences for follow up MD visits, lab draws and potential flares.

(Tr. at 1173.) Plaintiff expressed anger at these recommendations, feeling that she could not perform even part-time employment. She claimed it took her several hours to get out of bed in the morning secondary to pain, but Dr. Brenner pointed out that their session was in the a.m., and plaintiff was able to arrive on time, fully groomed, and ambulating independently.

24

Plaintiff reported that she came to see Dr. Brenner because her previous rheumatologist also did not think she needed disability. Dr. Brenner told plaintiff that she agreed with the prior rheumatologist and thought it was time for plaintiff to take initiative and obtain adequate psychological care, as recommended by two physicians. (Tr. at 1173.) Dr. Brenner noted that it could be that plaintiff's depression was disabling, and that she could be re-evaluated for disability based on that. However, she had to pursue adequate care for this issue, as she had been a no-show to at least one psychological appointment. Dr. Brenner arranged an appointment with plaintiff's primary doctor the same day to set up a psychological referral in the near future; she also started plaintiff on the anti-depressant Savella. (Tr. at 1174.)

On November 8, 2011, Dr. Brenner completed a report, listing diagnoses of SLE and fibromyalgia. (Tr. at 1084.) She wrote that plaintiff's lupus has been in decent control but her fibromyalgia had been challenging to control. (Tr. at 1085.) Rather than providing estimates of plaintiff's physical capacities of lifting, sitting, and standing, Dr. Brenner wrote "please refer to copy of functional capacity evaluation."[32] (Tr. at 1085.) Dr. Brenner did indicate that plaintiff could maintain sedentary and light level of exertion during an eight hour day. She further indicated that plaintiff was able to use her hands, communicate, and see without restriction. She stated that plaintiff's fibromyalgia would produce bad days and about two absences per month, but with a total of three to four days per month including doctor visits and lab tests. Dr. Brenner recommended a position without excessive activity, e.g., desk job. (Tr. at 1086.)

On December 1, 2011, plaintiff saw Dr. Rico Rodriguez at Procare, with generalized

_____

[32]The August 2011 FCE attached to Dr. Brenner's report listed maximum lifting of ten pounds, five pounds frequently and, based on plaintiff's subjective report, five minutes of sitting and standing. The report concluded that she "demonstrates activity tolerance at a less than sedentary level." (Tr. at 1088.)

body aches and pains, and right ear pain. (Tr. at 1261.) He provided a prescription for Amoxicillin and told her to take Tramadol as needed for pain. (Tr. at 1262.) On December 14, she saw Dr. Nwilati with sore throat, fever, and chills; her ear pain had improved but was now coming back. (Tr. at 1263.) Dr. Nwilati diagnosed otitis media with URI, providing Levaquin.[33] (Tr. at 1264.) On January 5, 2012, she saw Dr. Nwilati with a cold again, which the doctor related to weather changes, providing Z-Pak for URI. (Tr. at 1265.)

On January 21, 2012, plaintiff went to the St. Luke's ER after slipping and falling on ice. (Tr. at 1228.) On exam, doctors noted normal range of motion, with some tenderness. (Tr. at 1230.) They diagnosed cervical strain, provided pain medications, and discharged her in good condition. (Tr. at 1230-31.) A CT scan of the cervical spine showed no acute abnormalities. (Tr. at 1245.) On January 25, plaintiff saw Dr. Rodriguez at Procare, complaining of continued neck pain and headaches following her slip and fall, as well as pain and numbness in the right hand and wrist. (Tr. at 1267.) Dr. Rodriguez started PT and prescribed Flexeril. (Tr. at 1268.)

On January 27, 2012, plaintiff returned to Dr. Brenner. Her SLE was quiescent, but her fibromyalgia continued to be more of a problem. She actually did quite well in PT/OT but occasionally missed appointments. At the last visit, plaintiff was quite upset that Dr. Brenner did not recommend disability. Dr. Brenner was concerned about depression, setting up an appointment with her primary doctor the same day, but she did not go. She reported that she did see a psychologist or psychiatrist at St. Francis, but she was unsure of any diagnosis.[34]

---

[33]Levaquin is used to treat bacterial infections. http://www.drugs.com/levaquin.html.

[34]Records indicate that plaintiff saw Michael Cichy, Ph.D., a psychologist at Wheaton-St. Francis, in November and December 2011. (Tr. at 1089-92.) The records list a diagnosis of major depressive disorder, with a GAF of 57-67. (Tr. at 1089.) Her discharge was "unplanned," treatment goals not met, and her compliance "variable." (Tr. at 1089.)

She admitted missing a few appointments because she did not feel well. (Tr. at 1175.) Dr. Brenner noted plaintiff's non-adherence to follow up visits with providers, emphasizing the importance of making her appointments. Dr. Brenner also highly recommend that plaintiff continue exercise, but she did not seem interested in doing so. (Tr. at 1176.)[35]

On February 11, 2012, plaintiff went to the St. Luke's ER with abdominal pain. (Tr. at 1232.) Doctors ordered ultrasound and CT scans, provided medication for a pelvic infection, and discharged her in stable condition. (Tr. at 1237.) The pelvic CT and ultrasound showed a fibroid, unchanged, and Bartholin's cyst. (Tr. at 1246-48.) On March 21, plaintiff underwent a Bartholin cyst resection. (Tr. at 1154-56.)

On March 28, 2012, plaintiff saw Dr. Rodriguez at Procare, complaining of fever, sore throat, and coughing. (Tr. at 1270.) He gave her Z-Pak for acute pharyngitis, Robitussin for cough, and Tylenol for pain and fever. (Tr. at 1271.)

On April 24, 2012, plaintiff went to the St. Luke's ER with dizziness and vaginal pain. (Tr. at 1238.) Doctors diagnosed a UTI and provided Ciprofloxacin. (Tr. at 1242.) On May 1, plaintiff saw PA Phillips at Procare in follow up. Plaintiff said she was feeling better but continued to have ear pain, dizziness, and lightheadedness. However, PA Phillips noted no mention of any ear abnormalities in the ER records; she had been given Cipro for UTI. In follow up of the UTI, she was doing much better; she was to continue Cipro as directed. (Tr. at 1272.) Ear exam was unremarkable, but PA Phillips noted that possible inner ear problems

---

[35]Treatment notes show that plaintiff received PT in January and February 2012, after her slip and fall. She was again discharged secondary to non-compliance. (Tr. at 1121-22.)

were causing her pain and dizziness, providing Meclizine[36] and referring her to an ear, nose, and throat specialist. (Tr. at 1273.) Plaintiff saw Dr. Ruben Romero on that referral on May 3, indicating that she felt off balance, especially when trying to sit up or get out of bed in the morning, but with significant improvement of symptoms on Meclizine. She was able to do daily routine activities. Dr. Romero diagnosed probable resolving viral vestibular neuronitis; she was to continue on Meclizine as needed. (Tr. at 1275.)

On May 13, 2012, Dr. Brenner completed a fibromyalgia medical source statement. Dr. Brenner declined to provide an opinion regarding plaintiff's abilities, instead recommending that she receive a formal functional capacity evaluation. Dr. Brenner indicated that she highly recommended that plaintiff seek care from a psychologist or psychiatrist, but it was unclear if plaintiff had followed that recommendation. Dr. Brenner also recommended PT/OT/aquatics, but plaintiff did not make all of the appointments. (Tr. at 1283.)

Finally, on May 23, 2012, Dr. Nwilati completed a physical medical source statement, listing diagnoses of lupus and fibromyalgia, with symptoms of pain and fatigue, and a guarded prognosis. (Tr. at 1286.) He indicated that functional limitations should be decided by her rheumatologist. (Tr. at 1287-88.) He checked the box indicating that plaintiff would need unscheduled breaks, but when asked how often wrote: "unknown, hard to tell." (Tr. at 1287.) Asked about absences, he wrote: "variable." (Tr. at 1289.)

## C.     Plaintiff's Applications and Supporting Materials

Plaintiff filed the instant application on July 21, 2010, alleging an onset date of June 1, 2007. (Tr. at 164.) In her disability report, plaintiff indicated that she could not work due to

---

[36]Meclizine is used to prevent and treat nausea, vomiting, and dizziness caused by motion sickness. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682548.html.

lupus, inflammatory arthritis, cellulitis, heart murmur, stress, and anxiety. She indicated that she last worked on May 13, 2008. (Tr. at 185.) She reported a high school level education and past work doing data entry for Rockwell from April 2007 to May 2008 and for the City of Milwaukee from January 2004 to December 2006. (Tr. at 186.)

In subsequent disability reports, plaintiff complained of pain in her hands and feet, even with medications. She also noted mental problems. She indicated that her condition had been getting worse, such that she could barely walk. She also noted memory problems, trouble concentrating, and mood changes. (Tr. at 197.) She indicated that her fibromyalgia made her tired all the time. (Tr. at 206.)

The SSA denied the application initially on December 14, 2010 (Tr. at 94, 102) and on reconsideration on May 13, 2011 (Tr. at 95, 108, 114). Plaintiff requested review by an ALJ (Tr. at 119), and on May 30, 2012, she appeared with counsel for her hearing (Tr. at 138).

## D.    The Hearing

Preliminarily, counsel and the ALJ discussed the alleged onset date. The ALJ referenced May 13, 2008, the date plaintiff's previous application had been denied.[37] (Tr. at 46.) Counsel noted that the instant application listed an onset date of June 1, 2007, thus constituting a request to re-open the previous application. (Tr. at 47-48.) However, counsel indicated that it appeared plaintiff last worked on August 15, 2007, so he settled on that date. (Tr. at 48-49.) In his opening statement, counsel indicated that, according to the objective medical evidence, plaintiff's lupus was under control; however, the immunosuppressant drugs

---

[37]Res judicata may bar a subsequent claim for disability benefits based on the same issues. However, in some circumstances the Commissioner has discretion to reopen a prior application. See, e.g., Tobak v. Apfel, 195 F.3d 183, 186 (3d Cir. 1999).

she took to control it made her highly susceptible to illness, leading to absences from work. (Tr. at 51.) He further noted plaintiff's fibromyalgia, although plaintiff's treating rheumatologist did not provide an opinion on that, and Dr. Nwilati deferred to the rheumatologist. (Tr. at 52.)

### 1. Plaintiff's Testimony

Plaintiff testified that she was forty-two years old and lived with her husband and two children, ages fifteen and twelve. (Tr. at 52-53.) She had a high school level education. She had a driver's license and was able to drive. She had no income; her husband received unemployment compensation. (Tr. at 53-54.)

Plaintiff related past employment in customer service and data entry for the City of Milwaukee from January 2004 to December 2006, which involved putting citation numbers into the system. (Tr. at 54.) She indicated that she was fired from that job, which she attributed to pain in her hands, constant colds, and inability to remember instructions. (Tr. at 55.) After that, she worked at Rockwell doing data entry from April 2007 to May 2008. She did not work after thereafter (Tr. at 56), although she did study cosmetology, earning a diploma (Tr. at 57). She then earned a license, although it had expired by the time of the hearing. (Tr. at 57.)

Plaintiff testified that she could not work due to pain, aggravated by activity. (Tr. at 58-60.) Her medications causes side effects of dizziness and upset stomach. (Tr. at 60.) She further indicated that she forgot things easily. (Tr. at 61.) She was able to tend to her own hygiene, although her shoulders hurt. She did not do laundry, her children or husband did. (Tr. at 62.) Her husband and children also did the cleaning; she helped with the dishes at times. (Tr. at 63-64.)

Plaintiff indicated that she could sit for about an hour before she had to change positions. (Tr. at 64-65.) She could stand for fifteen minutes before she had to sit down. She

could walk a block before she had to stop and sit down.  (Tr. at 66.)  She could lift a gallon of milk.  (Tr. at 67.)  The ALJ noted that plaintiff's doctors wanted her to exercise; plaintiff said he tried but found it too painful.  (Tr. at 68.)  Plaintiff admitted that she stopped taking her lupus medications several times, stating that she wanted to overcome her sickness with faith.  Faith did not work, she got worse, so she decided to start taking her pills again.  (Tr. at 69.)

### 2. Plaintiff's Husband

Plaintiff's husband testified that he had been married to her for ten years, and that they owned a home together.  (Tr. at 74.)  He indicated that he had recently been laid off and thus spent more time at home; plaintiff spent most of her time in bed.  (Tr. at 75.)  When she tried to do something at home, she needed to go rest, and the next day her pain was worse.  (Tr. at 75-76.)  He and the children did most of the household chores.  (Tr. at 76-77.)

### 3. Vocational Expert

The VE classified plaintiff's data entry/customer service jobs as sedentary and semi-skilled.  (Tr. at 82.)  The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to sedentary work with a sit/stand option, changing positions from sitting to standing every thirty minutes; limited to frequent (not constant) handling and fingering; in a low stress job, defined as only occasional decision-making and only occasional changes in work setting; and off task 10% of the day (for whatever reason), in addition to regularly scheduled breaks.  (Tr. at 82-83.)  The VE testified that such a person could perform the customer service job but not the data entry, which involved constant use of the arms.  (Tr. at 83.)  The VE further testified that this person could perform other jobs, including general office clerk, receptionist, and credit clerk.  If the person had to

change positions at will, rather than every thirty minutes, the answer would be the same. (Tr. at 84.) In the person had to be reminded of tasks by a supervisor once per day, the jobs were not affected. (Tr. at 84-85.) However, if the person were off task more than 10% of the day these (and all other) jobs would be eliminated. (Tr. at 85.) Employers would not tolerate more than one absence per month on an ongoing basis. (Tr. at 85.)

**E.      ALJ's Decision**

On June 29, 2012, the ALJ issued an unfavorable decision. At step one, the ALJ determined that plaintiff had not engaged in SGA after the alleged onset date of August 15, 2007. While plaintiff performed some work in 2008, it did not rise to SGA levels. (Tr. at 21.)

At step two, the ALJ concluded that plaintiff suffered from the severe impairments of fibromyalgia, lupus, and depression. (Tr. at 21.) At step three, the ALJ found that none of these impairments met or equaled a Listing. (Tr. at 21.) The ALJ specifically considered Listing 14.02 regarding lupus and Listing 12.04 regarding depression, finding neither met. (Tr. at 21.) In assessing the B criteria of the Listings, the ALJ found mild limitation of ADL's, mild limitation in social functioning, moderate limitation in cpp, and no episodes of decompensation. (Tr. at 22-23.) The ALJ also considered fibromyalgia, which does not have a distinct Listing, finding that the evidence did not establish medical equivalence to a Listing. (Tr. at 22.)

The ALJ then determined that plaintiff retained the RFC to perform sedentary work with a sit/stand option allowing her to change positions at will; avoiding exposure to heights, hazards, and moving machinery; and limited to frequent bilateral handling and fingering. The ALJ further limited plaintiff to a low stress job, defined as requiring only occasional decision making and occasional changes in the work setting. She also had to be reminded of tasks one time per day. Finally, she would be off task up to 10% of the work day, in addition to regularly

32

scheduled breaks.  (Tr. at 23.)  In making this finding, the ALJ considered the credibility of plaintiff's statements regarding her alleged symptoms and limitations, and the medical opinion evidence.  (Tr. at 23-24.)

Plaintiff alleged disability due to symptoms associated with her fibromyalgia, lupus, and depression, but the ALJ found her only partially credible.  (Tr. at 26.)  The ALJ first noted that plaintiff's allegations were not entirely consistent with the objective medical evidence, completing a thorough review of the record.  (Tr. at 26.)

The ALJ noted that, despite being diagnosed with lupus in 2006, plaintiff maintained full-time employment through the alleged onset date and was able to perform some data entry work into 2008.  (Tr. at 24.)  The ALJ also noted that plaintiff stopped participating in rheumatologic follow-up and stopped taking prescribed medications in the first half of 2007; she re-started on medications in mid-2007 and by the fall of 2007 her symptoms had improved. (Tr. at 24-25.)  Following a June 2008 appointment, plaintiff sought no further rheumatologic care until March 2009, and during that time she participated in a cosmetology program, attending nearly 400 hours worth of instruction during a three month period, generally consisting of seven to eight hour shifts.  Despite this activity, when she returned to the clinic in March 2009 she reported doing well overall with good energy, only occasional arthralgias, and no joint swelling or stiffness.  She maintained follow up treatment through January 2011 for her fibromyalgia and lupus, reporting only intermittent, mild pain increases; physical exams were routinely unremarkable.  Plaintiff stopped treating with her rheumatologist in January 2011, apparently because the doctor expressed an opinion that plaintiff did not need disability. (Tr. at 25.)

Plaintiff then established rheumatologic care with Dr. Brenner in May 2011, alleging

symptoms including pain, stiffness, fatigue, and overall myalgias. Nevertheless, physical exam showed no erythema, warmth, swelling, or range of motion deficits. Dr. Brenner also noted that plaintiff had been referred for psychological evaluation several times due to evidence of depression but failed to show for multiple appointments. Subsequent treatment notes indicated that plaintiff's condition improved somewhat with medication adjustments. In addition, she underwent a physical therapy evaluation in August 2011 but was less than compliant with treatment, missing sessions, leading to discharge from treatment. Nonetheless, her rheumatologist noted therapist reports that plaintiff was able to perform all activities involved in treatment, never requested to stop any activities, and demonstrated objective improvement overall. In addition, prior to discharge, the therapists were planning to increase plaintiff's activity levels. Treatment non-compliance continued to be a trend, as Dr. Brenner noted that plaintiff failed to attend follow-up appointments with several providers. In addition, shortly after Dr. Brenner expressed a belief that plaintiff could perform at least part-time work, plaintiff became angry and upset, stopping further rheumatologic care as of January 2012. (Tr. at 25.)

Subsequently, plaintiff underwent additional physical therapy, but she did not comply with treatment again, being discharged after missing appointments. (Tr. at 25-26.) Medical records during the remainder of the relevant period reflected care for acute illnesses, as opposed to her lupus or fibromyalgia. (Tr. at 26.)

While plaintiff alleged disability in part due to her depression, the ALJ noted no significant mental health treatment since the alleged onset date. She occasionally reported depression but failed to attend scheduled psychiatric appointments on several occasions despite recommendations from numerous doctors. She reported depression, anxiety, and low energy to the consultative psychological examiner, Dr. Bestland, but mental status examination

was generally unremarkable. Aside from this exam, she attended only three mental health appointments between November and December 2011, and despite evidence of progress she was discharged from that treatment after non-compliance. (Tr. at 26.)

The ALJ also considered other factors in evaluating plaintiff's credibility. First, plaintiff failed to show restriction on her ability to perform daily activities consistent with the alleged severity of her impairments, noting her work during part of the relevant period and her attendance at nearly 400 hours of cosmetology school during a three-month period. Second, treatment records showed that her lupus was well-controlled when she remained compliant with prescribed treatment. Although she alleged greater difficulty controlling her fibromyalgia symptoms, physical exams were generally unremarkable throughout the relevant period. Further, the record contained minimal evidence of mental health treatment. Third, the ALJ found the effectiveness of plaintiff's treatment affected by regular non-compliance. She stopped or decreased medications on several occasions, failed to comply with physical therapy appointments, and failed to attend a number of scheduled appointments with other providers. (Tr. at 26.) The ALJ found that, in addition to diminishing the effectiveness of her care, this reflected poorly on her credibility. (Tr. at 26-27.)

Despite the fact that plaintiff's claims lacked objective medical support, the ALJ took them into account to some degree in setting RFC. In response to plaintiff's claim that she could sit for only one hour at a time, stand for only fifteen minutes at a time, and lift no more than a gallon of milk, the ALJ limited plaintiff to sedentary work with a sit/stand option. Given her complaints of hand pain, the ALJ limited plaintiff to no more than frequent bilateral handling and fingering. Based on limitations related to her depression, the ALJ limited plaintiff to low stress work that would allow for her to be reminded of tasks once per day. Finally, given the

35

combination of subjective pain complaints, mental health symptoms, and medication side effects, plaintiff was to avoid hazards and would be off task up to 10% of the day in addition to regularly scheduled breaks.  (Tr. at 27.)

The ALJ then turned to the medical opinions in the record.  First, the ALJ decided to give partial weight to the state agency medical consultants' reports, which found plaintiff capable of light work with no concentrated exposure to hazards and no more than frequent bilateral handling or fingering.  The ALJ noted that these doctors had the chance to review a substantial portion of the medical evidence and had special expertise in assessing impairments and limitations under social security law.  The ALJ found their conclusions generally consistent with the objective medical findings, the physical exam results, and the overall treatment documentation.  On review of the additional evidence received at the hearing level, and giving plaintiff's subjective allegations the benefit of the doubt, the ALJ further limited plaintiff to sedentary work with some additional limitations not assessed by the state agency doctors.  (Tr. at 27.)

The ALJ gave little weight to Dr. Brenner's opinions.  The ALJ noted that in October 2011 Dr. Brenner found plaintiff capable of performing at least part-time work that allowed for absences for follow up medical visits.  In November 2011, Dr. Brenner indicated that plaintiff was capable of sedentary and light work that did not involve excessive physical activity and allowed for several monthly absences for medical visits.  Nonetheless, Dr. Brenner also cited the conclusions set forth in the August 2011 functional capacity evaluation as an accurate reflection of plaintiff's abilities, even though they were inconsistent with Dr. Brenner's opinions. Then, in May 2012, Dr. Brenner noted that she was unable to assess plaintiff's overall physical abilities and suggested a complete functional capacity assessment.  The ALJ noted that

although Dr. Brenner had a treatment relationship with plaintiff during the relevant time period, it consisted of only five appointments between May 2011 and January 2012, with no indication that plaintiff had participated in further rheumatologic care since then. Overall, the ALJ found Dr. Brenner's conclusions generally inconsistent with and not supported by the evidence of record. (Tr. at 27.) In addition, Dr. Brenner's most recent report indicated an inability to assess any limitations, which called into question the doctor's previous conclusions. (Tr. at 27-28.) Finally, the ALJ found Dr. Brenner's conclusion regarding absences highly speculative, as there was no reason to assume that a medical visit would prevent plaintiff from attending a whole day of work on a regular basis. (Tr. at 28.)

The ALJ also gave very little weight to Dr. Nwilati's opinions. In July 2011, Dr. Nwilati concluded that plaintiff could not work, but he did not provide any specific estimate of her functional abilities. In his most recent assessment in May 2012, Dr. Nwilati no longer asserted that plaintiff could not work, reserving any such determination for plaintiff's treating rheumatologist. The record reflected that Dr. Nwilati had a treating relationship with plaintiff, but it centered on general medical care, including short-term, acute illness, rather than management of her fibromyalgia and lupus. His conclusions were also internally inconsistent as he alleged an overall inability to work in July 2011 but did not confirm that finding in May 2012. In addition, plaintiff's treating rheumatologist, to whom Dr. Nwilati deferred, had never alleged that plaintiff is unable to work. Finally, the ALJ noted that conclusions as to a claimant's overall ability to work are reserved to the SSA. (Tr. at 28.)

The ALJ also gave little weight to the opinion of Ashley Maher, a physical therapist, who performed a one-time disability evaluation in August 2011. She concluded that plaintiff demonstrated an activity tolerance at a less than sedentary level. However, that appeared to

be based largely on subjective complaints. Functional testing revealed that plaintiff could lift ten pounds occasionally and five pounds frequently, generally consistent with sedentary work. Nonetheless, plaintiff reported a sitting and standing tolerance of only five minutes, which was never confirmed by objective testing or evaluation. The ALJ found a restriction to less than sedentary work unsupported by the findings during this evaluation and the overall evidence of record. (Tr. at 28.)

Regarding plaintiff's mental limitations, the ALJ gave partial weight to the state agency psychological consultants, who concluded that plaintiff's impairments would cause no more than mild to moderate limitations. They further concluded that plaintiff could perform unskilled work with no more than moderate change in the workplace. These consultants, like their physical counterparts, were able to review a substantial portion of the medical evidence and had special expertise in assessing mental impairments and limitations under social security law. Their conclusions were generally supported by the record and consistent with the ALJ's step three finding. The ALJ found plaintiff limited to low stress work involving only occasional decision making and changes. (Tr. at 28.) She would also need to be reminded of tasks once a day due to subjective memory complaints, as well as be off task up to 10% of the work day due to a combination of mental health symptoms and pain. (Tr. at 28-29.)

Finally, the ALJ gave little weight to the opinion of the consultative psychological examiner, Dr. Bestland, who assessed a GAF of 41-50, indicative of serious symptoms or impairment in functioning. Dr. Bestland evaluated plaintiff just once, providing a one-time estimate of plaintiff's functioning, with no specific guidance regarding her ability to work. Further, the assessment considered factors irrelevant to disability, including psycho-social and socioeconomic stressors. The ALJ gave greater weight to plaintiff's treating psychologist, who

38

estimated GAF scores between 57 and 67, indicative of mild to moderate impairment.[38]  (Tr. at 29.)

Taking into consideration plaintiff's subjective complaints, as well as the objective medical evidence, the ALJ concluded that plaintiff was capable of a range of sedentary work. Then, at step four, the ALJ determined that plaintiff remained capable of performing her past relevant work as a customer service representative.  The ALJ found that plaintiff performed this work long enough to learn its requirements and to earn income equivalent to substantial gainful activity.  In comparing plaintiff's RFC with the requirements of this job, the VE testified that plaintiff could do this job as it was actually performed.  (Tr. at 29.)  The ALJ made alternative findings at step five.  Considering her age, education, work experience, and RFC, the ALJ found her capable of performing other jobs, as identified by the VE, including general office clerk, receptionist, and credit/insurance clerk.  (Tr. at 30.)  The ALJ accordingly found plaintiff not disabled.  (Tr. at 31.)

Plaintiff requested Appeals Council review  (Tr. at 15), but on September 23, 2013, the Council denied her request (Tr. at 1).  This action followed.

### III.  DISCUSSION

In this court, plaintiff argues that the ALJ (1) failed to give proper weight to the medical source opinions, instead substituting his own lay opinion, and (2) made an erroneous RFC determination, presenting the VE with an incomplete hypothetical question.

---

[38]The ALJ noted that this assessment, though more consistent with the overall evidence, provided little guidance regarding plaintiff's ability to work and considered irrelevant factors under disability law.  (Tr. at 29.)

**A.    Medical Source Opinions**

**1.    Applicable Legal Standards**

The ALJ must consider the medical opinions in the record.  <u>See</u> 20 C.F.R. § 404.1527(c). Opinions from the claimant's treating physician are entitled to "special significance" and will, if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the case record, be given "controlling weight."  SSR 96-8p, 1996 WL 374184, at *7.  If the ALJ finds that a treating source's opinion does not meet the standard for controlling weight, he may not simply reject it, SSR 96-2P, 1996 WL 374188, at *4; rather, he must determine what weight the opinion does deserve by considering a variety of factors, including the length, nature and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist.  <u>Scott v. Astrue</u>, 647 F.3d 734, 740 (7th Cir. 2011); <u>Bauer v. Astrue</u>, 532 F.3d 606, 608 (7th Cir. 2008).  Whenever an ALJ discounts a treating source's opinion, he must provide "good reasons."  <u>Scott</u>, 647 F.3d at 739.  Opinions from non-physician providers, such as physical therapists, may not receive controlling weight, <u>see</u> 20 C.F.R. 404.1502, but should nevertheless be considered on issues such as impairment severity and functional limitations, <u>see</u> <u>Barrett v. Barnhart</u>, 355 F.3d 1065, 1067 (7th Cir. 2004).  Finally, the ALJ must consider the opinions of state agency consultants, as they are "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims," SSR 96-6p, 1996 WL 374180, at *2, and may bring to the case both impartiality and expertise, <u>Books v. Chater</u>, 91 F.3d 972, 979 (7th Cir. 1996).

**2. Analysis**

      **a. Opinions Regarding Physical Condition**

As indicated above, the ALJ gave "partial weight" to the opinions of the state agency medical consultants (Tr. at 27); "little weight" to Dr. Brenner's opinions (Tr. at 27); and "very little weight" to Dr. Nwilati's opinions (Tr. at 28).[39] Plaintiff argues that in so doing the ALJ relied on his own lay opinion instead of adopting the view of the medical professionals. See Rousey v. Heckler, 771 F.2d 1065, 1069 (7th Cir. 1985) ("The ALJ cannot make his own independent medical determinations about the claimant.").

The ALJ determines RFC based on the entire record; he need not adopt "a particular physician's opinion or choose between the opinions any of the claimant's physicians." Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007). In the present case, the ALJ generally credited the state agency consultants' opinions that plaintiff remained able to perform a range of unskilled, light work, but gave her the benefit of the doubt in imposing further limitations based on the testimony and additional evidence presented at the hearing level. See Diaz, 55 F.3d at 306 n.2 (stating that the ALJ need not rely solely on the opinions of physicians in determining RFC; rather, the ALJ must consider the entire record, including all relevant medical and non-medical evidence, such as the claimant's own statements); see also Rudicel v. Astrue, 282 Fed. Appx. 448, 453 (7th Cir. 2008) (noting that the ALJ does not improperly "play doctor" by determining ability to work, for that is an issue reserved to the Commissioner).

Plaintiff further argues that the ALJ failed to give good reasons for discounting the treating source opinions from Drs. Nwilati and Brenner. As the ALJ noted, in July 2011, Dr.

---

[39]The ALJ also gave"little weight" to the opinion of the physical therapist. (Tr. at 28.) Plaintiff does not contest that determination.

Nwilati, plaintiff's primary care physician,[40] opined that plaintiff was "unable to work," but he did not provide any specific estimate of her functional capabilities. (Tr. at 28, 1080.) This bald statement did not constitute a "medical opinion" under the regulations. See 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions."). As the ALJ noted (Tr. at 28), conclusions as the claimant's overall ability to work are reserved to the Commissioner. See Sawyer v. Colvin, 512 Fed. Appx. 603, 609 (7th Cir. 2013) (citing Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir. 2002)); see also 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled or 'unable to work' does not mean that we will determine that you are disabled."). The ALJ was thus not required to give any "special significance" to Dr. Nwilati's assertion that plaintiff could not work. See 20 C.F.R. § 404.1527(d)(3).

Nevertheless, the ALJ did not ignore this statement. See Bjornson v. Astrue, 671 F.3d 640, 647-48 (7th Cir. 2012) (indicating that while statements on issues reserved to the Commissioner need not receive special significance, they should not be ignored). The ALJ noted that the July 2011 report was inconsistent with Dr. Nwilati's May 2012 report, in which he no longer asserted that plaintiff could not work, instead deferring to plaintiff's treating rheumatologist.[41] (Tr. at 28, 1287-88.) See Ketelboeter v. Astrue, 550 F.3d 620, 625 (7th Cir. 2008) (noting that the ALJ may discount a treating physician opinion that is internally

---

[40]Plaintiff incorrectly labels Dr. Nwilati her treating rheumatologist. (Pl.'s Br. at 9.)

[41]Plaintiff argues that Dr. Nwilati's May 2012 report also supported a finding of disability (Pl.'s Br. at 10), but as the ALJ noted, this report deferred the issue to Dr. Brenner.

inconsistent). The ALJ further noted that while Dr. Nwilati had a treating relationship with plaintiff, the nature of that relationship focused on general medical care and the treatment of acute, short-term illnesses, as opposed to management of her fibromyalgia or lupus. (Tr. at 28.) See 20 C.F.R. § 404.1527(c)(2) & (5) (directing the ALJ to consider the nature and extent of the treatment relationship, and the doctor's specialty). Finally, the ALJ noted that plaintiff's treating rheumatologist – to whom Dr. Nwilati ultimately deferred – did not support plaintiff's claim of disability. (Tr. at 28.) See 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."). Aside from generally arguing that Dr. Nwilati's opinions were consistent with the overall medical evidence, plaintiff provides no basis for rejecting the ALJ's reasoned evaluation.

Plaintiff does take issue with some of the reasons the ALJ provided for discounting Dr. Brenner's opinions, but those contentions lack merit. Plaintiff first argues that the ALJ should not have relied on Dr. Brenner's notation that plaintiff was capable of performing part-time work. See Elder v. Astrue, 529 F.3d 408, 414 (7th Cir. 2008) (citing Bladow v. Apfel, 205 F.3d 356, 359 (8th Cir. 2000) (explaining that, under SSR 96-8p, the ability to work only part-time mandates a disability finding)). As the ALJ noted, however, Dr. Brenner said that plaintiff could perform "at least part time work" allowing for absences for medical visits. (Tr. at 27, 1173, emphasis added). As the ALJ also noted, Dr. Brenner made this statement in the context of declining to support plaintiff's disability claim. (Tr. at 25, 1173.) Specifically, Dr. Brenner stated: "[Plaintiff] has reported that she came to see me because her prior rheumatologist also did not think she needed disability at this point in time. I told her I agree with her prior rheumatologist and I think it is time for her to take initiative and obtain psychological care which has been recommended by 2 physicians." (Tr. at 1173.)

43

Plaintiff also challenges the ALJ's conclusion that Dr. Brenner's opinions were inconsistent with the record. However, the ALJ pointed to several specific inconsistencies. In November 2011, Dr. Brenner opined that plaintiff could perform sedentary and light work, yet she also referenced the August 2011 functional capacity evaluation, which demonstrated activity tolerance at less than the sedentary level. (Tr. at 27, 1085, 1088.) Then, in May 2012, Dr. Brenner indicated that she was unable to assess plaintiff's overall physical abilities, instead suggesting a complete functional capacity assessment. (Tr. at 27.) As with Dr. Nwilati's reports, it was reasonable for the ALJ to find that these shifting statements rendered Dr. Brenner's opinions less reliable. See Berger v. Astrue, 516 F.3d 539, 545 (7th Cir. 2008) (affirming ALJ's rejection of treating source opinion where the doctor had not, by her own admission, assessed his functional capacity).

Plaintiff cites certain treatment notes in support of Dr. Brenner's opinion that she would miss three to four days per month due to "bad days." (Pl.'s Br. at 10-11.) As the ALJ noted, however, Dr. Brenner opined that plaintiff would miss a total of three to four days per month due to doctor visits and bad days. (Tr. at 28, 1086.) The ALJ found speculative the notion that plaintiff would regularly miss entire days of work due to follow up medical visits and lab tests. (Tr. at 28.) The ALJ's conclusion in this regard is bolstered by his finding regarding plaintiff and Dr. Brenner's treatment relationship, which consisted of just five appointments between May 2011 and January 2012, after which plaintiff sought no further rheumatologic care. (Tr. at 27.)[42] See Goins v. Colvin, No. 12 C 4057, 2013 WL 5609336, at *11 (N.D. Ill. Oct. 11, 2013)

_____

[42]Earlier in his decision, in discussing plaintiff's non-compliance with treatment, the ALJ noted that plaintiff became angry and upset when Dr. Brenner refused to support her disability claim, and that she stopped attending rheumatologic care shortly thereafter. (Tr. at 25.)

("Moreover, Dr. Harsoor 'saw the claimant only a few times prior to making this extreme opinion,' (R. 29) and the weight to be accorded a treating doctor's opinion is, in part, a function of how often he saw the patient.").

Plaintiff next argues that the ALJ failed to provide a sufficient explanation for partially crediting the state agency consultants' reports. As indicated above, the medical consultants found plaintiff capable of light work, but the ALJ gave plaintiff the benefit of the doubt in further limiting her to a range of sedentary work. (Tr. at 27.) Plaintiff argues that the ALJ's statement that the consultants' reports were "generally consistent" with the medical evidence was insufficient to justify adopting them over the treating sources. As the ALJ explained, however, the treating sources ultimately declined to provide any estimate of plaintiff's functional capacity. See Books, 91 F.3d at 978 ("Given that Dr. Lloyd failed to venture an opinion as to the extent of Books's limitations or as to his residual capabilities, the evidentiary usefulness of his findings is slight, at best."). Moreover, the ALJ provided, throughout the body of his decision, reasons for crediting the consultants' assessment that plaintiff remained able to work full-time. See Rice v. Barnhart, 384 F.3d 363, 370 n.5 (7th Cir. 2004) (explaining that, because it is proper to read the ALJ's decision as a whole, it would be a needless formality to require the ALJ to repeat substantially similar factual analyses).

For instance, the ALJ noted that after being diagnosed with lupus in 2006 plaintiff maintained full time employment through the alleged onset date and was able to perform some work in 2008. (Tr. at 24.) After the alleged onset date, she participated in a cosmetology program, attending nearly 400 hours of instruction during a three month period, generally consisting of seven and eight hour shifts. (Tr. at 25, 226-27.) The ALJ also noted plaintiff's sporadic medical visits and non-compliance with treatment; when she regularly took her

45

medications, she generally reported improvement in symptoms. (Tr. at 24-25.) The ALJ further noted the generally unremarkable physical exam findings, and that much of the medical evidence during the relevant period pertained to treatment of acute illnesses, as opposed to care of her fibromyalgia or lupus. (Tr. at 25-26.) Finally, the ALJ noted that plaintiff switched doctors after her rheumatologist opined that she did not need disability. (Tr. at 25, 658-69, 1173.)

In her brief, plaintiff cites medical notes showing that she treated for lupus since her alleged onset date, and that she sometimes complained of worsening symptoms. "That may be true, but the existence of these diagnoses and symptoms does not mean the ALJ was required to find that [plaintiff] suffered disabling impairments." Skinner, 478 F.3d at 845. Nor was the ALJ required to cite every treatment note in the record that mentioned plaintiff's symptoms. The ALJ conducted a thorough review of the record, concluding that plaintiff's symptoms generally improved when she complied with treatment. Substantial evidence supports that conclusion. Similarly, for the reasons set forth above, substantial evidence supports the ALJ's decision to give greater weight to the consultants' opinions than to the treating sources.

### b.    Opinions Regarding Mental Condition

Regarding plaintiff's mental limitations, the ALJ gave "partial weight" to the opinions of the state agency psychological consultants (Tr. at 28) and "little weight" to the opinion of the consultative psychological examiner, Dr. Bestland (Tr. at 29). Plaintiff argues that these opinions are generally consistent with each other and provide evidence that she is more limited than the ALJ determined. Plaintiff further argues that by failing to rely on these opinions the ALJ substituted his own lay opinion in determining plaintiff's mental abilities.

46

As indicated above, the ALJ need not in determining RFC rely on any particular doctor's opinion; rather, he must consider the entire record. See Schmidt, 496 F.3d at 845. That is what the ALJ did here. Dr. Bestland evaluated plaintiff, offering diagnoses of depressive disorder and pain associated with psychological factors and general medical condition, with a GAF of 41-50. (Tr. at 876.) However, he offered no specific opinion on her work capacity. Consultant Lefevre assessed mild restrictions of ADL's, no difficulties in social functioning, moderate difficulties in cpp, and no episodes of decompensation (Tr. at 896), finding plaintiff capable of unskilled work (Tr. at 902). Consultant Kojis found moderate restriction of ADL's, mild difficulties in social functioning, moderate difficulties in cpp, and no episodes of decompensation. (Tr. at 1057.) She found plaintiff capable of unskilled work with no more than a moderate degree of change. (Tr. at 1059, 1062.)

The ALJ gave little weight to Dr. Bestland's report because he evaluated plaintiff on only one occasion, provided no specific guidance as to her ability to work, and considered irrelevant factors such as socioeconomic stressors.[43] The ALJ also contrasted Dr. Bestland's score of 41-50 with the scores provided by plaintiff's treating psychologist (between 57 and 67), indicative of mild to moderate symptoms. (Tr. at 29, 1089.) Plaintiff focuses on the ALJ's "one-

---

[43]In the Seventh Circuit's recent Williams case, the ALJ discounted a GAF score because it took into account the claimant's frustration over her financial situation. The Seventh Circuit found this troubling because the psychiatrist made clear that the claimant "was frustrated, stressed out, and feeling guilty (all of which are mental) because of her disabilities and pain." 2014 WL 2964078, at *3. The Williams court ultimately reversed because the ALJ failed to consider the combined effects of all impairments in formulating RFC. As discussed below, the ALJ did not make the same mistake here; in formulating RFC, he specifically considered the combined effects of plaintiff's pain and mental limitations. The ALJ also provided further reasons and cited contrary evidence in giving little weight to Dr. Bestland's report. Thus, any possible error in discounting Dr. Bestland's GAF score based in part on "socioeconomic" considerations was harmless.

47

time estimate" rationale, arguing that this goes against the point of having the claimant meet with a consultative examiner. But the ALJ need not invariably adopt the opinion of an examining doctor over that of a non-examining consultant, see Beardsley, 2014 WL 3361073, at *4 ("As a general rule, an ALJ is not required to credit the agency's examining physician in the face of a contrary opinion from a later reviewer or other compelling evidence."), and plaintiff offers no response to the other reasons the ALJ gave, see Givens v. Colvin, 551 Fed. Appx. 855, 860 (7th Cir. 2013) (affirming ALJ's rejection of examining source opinion).[44] The ALJ then adopted a mental RFC largely consistent with the consultants' view that plaintiff remained capable of unskilled work with no more than moderate change, adopting restrictions to low stress work involving no more than occasional decision making and changes, with daily reminders due to memory problems, and being off task 10% of the day due to mental health symptoms and pain. (Tr. at 28-29.) Plaintiff criticizes the ALJ for not adopting the consultants' opinions in toto, but as indicated above the ALJ need not do that in determining RFC. Substantial evidence supports the ALJ's determination in this case, and he provided a sufficient explanation for it.

**B.      RFC Determination/Hypothetical Questions to VE**

**1.      Applicable Legal Standards**

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities, despite her impairments, in a work setting on a regular and continuing basis.

---

[44] In any event, as Dr. Bestland provided no specific guidance on plaintiff's ability to work, it is unclear how the ALJ could have incorporated his report into the RFC. Cf. Beardsley, 2014 WL 3361073, at *4-5 (reversing where the ALJ failed to provide a good explanation for rejecting the opinion of the examining consultant that plaintiff was limited to sedentary work and thus disabled under the Grid).

SSR 96-8p, 1996 WL 374184, at *1.  In determining RFC, the ALJ must consider both the "exertional" and "non-exertional" capacities of the claimant.  Exertional capacities include the claimant's ability to perform each of seven strength demands – sitting, standing, walking, lifting, carrying, pushing, and pulling.  Id. at *5.  These functions are typically translated into the exertional categories of sedentary, light, medium, or heavy work.  Id. at *3.  Non-exertional capacity includes all work-related functions that do not depend on physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., the ability to understand, carry out and remember instructions, and to respond appropriately to supervision, coworkers and customary work pressures in a work setting) activities.  Id. at *6.  The RFC assessment must be based on all of the relevant evidence in the case record, and the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not themselves "severe."  Id. at *5.  Finally, if the ALJ relies on VE testimony at steps four or five, he ordinarily must include in his hypothetical questions all limitations supported by medical evidence in the record.  Simila v. Astrue, 573 F.3d 503, 520 (7th Cir. 2009).

## 2.    Analysis

As indicated above, the ALJ determined that plaintiff retained the RFC to perform sedentary work with a sit/stand option allowing her to change positions at will; avoiding exposure to heights, hazards, and moving machinery; and limited to frequent bilateral handling and fingering.  The ALJ further limited plaintiff to a low stress job, defined as requiring only occasional decision making and occasion changes in the work setting.  She also had to be reminded of tasks one time per day.  Finally, she would be off task up to 10% of the work day, in addition to regularly scheduled breaks.  (Tr. at 23.)

Plaintiff first argues that the ALJ's physical findings are not supported by substantial evidence. Specifically, she contends that the medical evidence shows that she cannot frequently use her hands, and that her pain would interfere with her ability to perform physical tasks and attend work on a regular basis. She cites treatment notes in which she complained of pain in her hands and other parts of the body. (Pl.'s Br. at 18-19.) However, she fails to specify how this evidence supports limitation on her ability to use her hands beyond what the ALJ found. Indeed, plaintiff's own doctor opined that plaintiff could use her hands and fingers 100% of the day. (Tr. at 1086.) Further, the ALJ accounted for plaintiff's subjective pain complaints, despite the fact that they lacked objective medical support: in response to her claimed restrictions in sitting, standing, and lifting, he limited her to sedentary work with a sit/stand option; given her complaints of hand pain, he limited her to no more than frequent bilateral handling and fingering; based on symptoms related to her depression, he limited her to low stress work that would allow for her to be reminded of tasks once per day; and given the combination of subjective pain complaints, mental health symptoms, and medication side effects, he limited her exposure to hazards and allowed her to be off task up to 10% of the day in addition to regularly scheduled breaks. (Tr. at 27.) Nothing in the objective medical evidence plaintiff cites supports greater limitation, and as discussed above the ALJ reasonably rejected Dr. Brenner's earlier opinion as to excessive absences.

Plaintiff further argues that the ALJ failed to account for all of her mental limitations in the RFC and in his questions to the VE. She cites O'Connor-Spinner v. Astrue, 627 F.3d 614 (7th Cir. 2010), for the proposition that restricting a claimant to unskilled work will not necessarily account for limitations in cpp. However, the Seventh Circuit has not insisted on a per se requirement that this specific terminology ("concentration, persistence and pace") be

50

used in the hypothetical in all cases. Id. at 619. In some cases, the ALJ may use alternative phrasing that specifically excludes those tasks that someone with the claimant's limitations would be unable to perform. Id. That is what the ALJ did here. Rather than simply limiting plaintiff to unskilled work, he added limitations regarding work stress, decision making, and changes in the work place; he further allowed for daily reminders of her duties to memory problems; and he allowed her to be off task 10% of the day due mental health symptoms and pain. Courts have sustained similar RFC determinations/hypothetical questions against O'Connor-Spinner challenges. See, e.g., Felmey v. Colvin, No. 13-C-219, 2013 WL 4502090, at *18 (E.D. Wis. Aug. 22, 2013); Zoephel v. Astrue, No. 12-C-726, 2013 WL 412608, at *11 (E.D. Wis. Feb. 1, 2013) (collecting cases); Reed v. Astrue, No. 10 C 0001, 2011 WL 3895302, at *13 (N.D. Ill. Aug. 31, 2011).

Plaintiff cites the subjective complaints set forth in Dr. Bestland's report, but the ALJ did not fully credit those statements. See Schmidt, 496 F.3d at 846 ("[T]he ALJ is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible."). She also cites the various "moderate" limitations in the "summary conclusions" section of Dr. Kojis's mental RFC report. However, she fails to acknowledge that in the narrative section of her report Dr. Kojis opined that, despite these limitations, plaintiff remained capable of unskilled work with no more than a moderate degree of change; the ALJ incorporated into the RFC and hypothetical the limitations in the narrative section.

To be sure, an ALJ's decision is not insulated from review just because he relied on a consultant who purported to "translate" the limitations from the summary section into a narrative RFC allowing work. See Yurt v. Colvin, No. 13-2964, 2014 WL 3362455, at *7 (7th Cir. July 10, 2014) (citing Johansen v. Barnhart, 314 F.3d 283 (7th Cir. 2002)); Olson v. Colvin, No. 13-C-15,

51

2013 WL 5230799, at *15 (E.D. Wis. Sept. 17, 2013). In Yurt, for instance, the ALJ credited the opinion of a state agency psychological consultant who, after finding various "moderate" limitations, including in the claimant's ability to understand and carry out instructions, perform within a schedule, and maintain a consistent pace, drafted an RFC for unskilled work in a work environment with few people and low levels of stress. 2014 WL 3362455, at *3. The Seventh Circuit found the consultant's "translation" flawed, as it failed to address any cpp limitations. Id. at *7. Likewise, the ALJ's hypothetical question to the VE referred only to unskilled work and difficulties in social functioning, failing to capture the claimant's documented difficulties with concentration, persistence, and pace. Id. at *8.[45]

In the present case, the ALJ did not rely on any particular report in setting RFC. As discussed above, he considered the entire record, partially crediting the reports of both consultants. Moreover, Dr. Kojis, in her narrative RFC, specifically discussed plaintiff's issues with persistence and concentration, nevertheless finding her capable of unskilled work with no more than a moderate degree of change. (Tr. at 1062.) Finally, in both his hypothetical question and the RFC, the ALJ included limitations related to concentration (allowing daily reminders of tasks) and persistence/pace (low stress work, with only occasional decision making and changes; and off task up to 10% of the day, in addition to regular breaks). While it may have been better for the ALJ to use specific cpp terminology in his RFC and hypothetical questions, plaintiff fails to demonstrate that the ALJ's alternate phrasing failed to reasonably account for her mental limitations.

---

[45]To make matters worse, the hypothetical also omitted "low stress," despite the inclusion of that limitation in the consultant's narrative RFC. Id. at *7.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 15th day of July, 2014.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge